T.C. Memo. 2010-15

UNITED STATES TAX COURT

SIVATHARAN NATKUNANATHAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17291-07.                    Filed February 1, 2010.

R determined a deficiency and an addition
to tax under sec. 6651(a)(1), I.R.C., for failure
to file on time.  In response, P claimed a
qualified business stock exclusion under sec.
1202, I.R.C., deductions for uncollected software
development invoices under sec. 165, I.R.C., as
business losses or, alternatively, under sec. 166,
I.R.C., as bad debt losses, and deductions for
meals and entertainment, advertisement, rent, and
utilities expenses under sec. 162, I.R.C.

<u>Held</u>:  P may not claim a sec. 1202, I.R.C.,
qualified business stock exclusion to shield from
tax any part of the proceeds from the sale of
stock acquired upon exercise of employee stock
options where P has not established that either
the options or the stock constituted qualified
small business stock within the meaning of sec.
1202, I.R.C.

**Held**, **further**, P may not deduct billed and unreceived amounts that have not been previously included in income.

**Held**, **further**, P may not deduct as business expenses meals and entertainment, advertisement, rent, and utilities expenditures that are substantiated solely by a log of such expenditures and in the absence of any primary evidence of having made such expenditures.

**Held**, **further**, P is liable for the late filing addition to tax where he has admitted to having filed his return late and has failed to provide any reasons for the delay.

Sivatharan Natkunanathan, pro se.

Robert H. Berman, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WHERRY, Judge:  This case is before the Court on a petition for redetermination of deficiency, an addition to tax under section 6651(a)(1)[1] for a failure to file on time, and an accuracy-related penalty under section 6662(a) that respondent determined for petitioner's 2003 tax year.  After mutual concessions,[2] the issues for decision are:

---

[1]All section references are to the Internal Revenue Code (Code) of 1986, as amended and in effect for the tax year at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Petitioner conceded the following amounts of previously unreported income items:  $90 (interest), $460 (dividend), and $25,182 (State refunds, credits, or offsets).  Respondent

(continued...)

(1) Whether petitioner is entitled to the qualified small business stock exclusion of section 1202;

(2) whether petitioner is entitled to business loss or bad debt deductions for contracted payment amounts for software development that he was unable to collect;

(3) whether petitioner is entitled to business expense deductions for meals and entertainment, advertisement, rent, and utilities expenditures in excess of those respondent allowed or conceded; and

(4) whether petitioner is liable for an addition to tax under section 6651(a)(1).

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are

---

[2](...continued)
conceded various losses and deductions that were previously disallowed.  These included an S corporation loss of $7,706 claimed on Schedule E, Supplemental Income and Loss, a $26,919 deduction for unreimbursed employee expenses claimed on Schedule A, Itemized Deductions, and the following deductions claimed on Schedule C, Profit or Loss From Business:  $7,787 (car and truck expenses), $2,106 (travel expenses), $3,257 (legal and professional services expenses), $5,250 (depreciation and section 179 expenses), $2,559 (office expense), $500 (repairs and maintenance expenses), $1,200 (taxes and license expenses), $1,849 (telephone expenses) $90 (bank charges), $593 (dry cleaning expenses) and $455 (DSL expenses).  In a posttrial brief, respondent also conceded the accuracy-related penalty under sec. 6662(a).  Finally, petitioner and respondent have agreed upon a Schedule A itemized deduction of $8,523 for cash charitable contributions instead of the previously claimed $17,374, with petitioner conceding the remainder.

incorporated herein by this reference.  Petitioner resided in California at the time he filed the petition.

Petitioner became an employee of Cognet Microsystems (Cognet), a domestic C corporation, before 2001.  Some time during his employment at Cognet, petitioner received options to purchase Cognet stock as compensation for services rendered to that corporation.  Petitioner retained these options until after Cognet merged with Intel Corp. (Intel), another domestic C corporation, in 2001.  As part of the merger agreement, petitioner's options to purchase Cognet stock converted into options to purchase Intel stock.  Petitioner exercised his options to purchase Intel stock sometime in the fourth quarter of 2003 and on the same day sold the Intel stock that he had received upon exercise for a gain of $295,285.  This amount was reported on a Form W-2, Wage and Tax Statement, that petitioner received from Intel for 2003.

Petitioner's original Federal income tax return for 2003 was prepared and signed on October 15, 2004, and received by respondent on October 21, 2004, more than 6 months after its due date of April 15, 2004.  This return showed a tax liability of $50,850, taxes withheld of $26,437, and, after adding a self-reported estimated tax penalty of $554, a balance due of $24,967. Petitioner has subsequently sought to amend this return on at

least three separate occasions.[3]  Working from petitioner's original 2003 return, respondent determined a deficiency of $126,089.  Respondent also imposed an addition to tax of $19,279.55 for late filing.  On May 3, 2007, respondent sent petitioner, who resided in California at that time, a statutory notice of deficiency.[4]  Petitioner, who continued to be a California resident, filed a timely mailed petition with this Court on August 2, 2007, requesting a trial in Los Angeles, California.  The trial was held on October 23, 2008.

## OPINION

At the trial and in his posttrial briefs and other filings, petitioner claims that he is not liable for the deficiency but is, in fact, owed a refund of at least $26,437, the entire amount of Federal income tax withheld for 2003.  In support of this claim, petitioner advances three broad arguments.  First, he contends that the qualified small business stock exclusion of section 1202 applies to his sale of Intel stock and, therefore, he is entitled to exclude 50 percent of the resulting gain.

---

[3]Amended income tax returns on Forms 1040X, Amended U.S. Individual Income Tax Return, for 2003 for petitioner were received by respondent on Nov. 10, 2005, and Apr. 22, 2008, respectively.  Subsequently, after the record in this case was closed upon the filing of reply briefs, petitioner sought to file another amended return on Form 1040X for 2003 dated Apr. 15, 2009.

[4]In this notice of deficiency, respondent also determined an accuracy-related penalty under sec. 6662(a) of $12,998.80 that he subsequently conceded.  See supra note 2.

Second, petitioner argues that his failure to collect on invoiced amounts under software design and development contracts constitute business losses or bad debt losses. Therefore, he is entitled to deduct such amounts. And third, petitioner claims that a "business purpose log" listing expenditures for meals and entertainment, advertisement, rent, and utilities, that "contains generic points of discussion relating to business * * * should satisfy the substantiation requirements" of section 162 and, where applicable, section 274. Consequently, he is entitled to deduct the expense amounts shown on the log. For the reasons discussed below, we reject each of these arguments.

We note initially that petitioner has neither argued nor established that section 7491(a) applies to shift the burden of proof to respondent on any of the three arguments that he makes. Consequently, petitioner bears the burden of proof for each of these arguments. See Rule 142(a).

## I. Section 1202 Qualified Small Business Stock Exclusion

Section 1202(a)(1) provides that "In the case of a taxpayer other than a corporation, gross income shall not include 50 percent of any gain from the sale or exchange of qualified small business stock held for more than 5 years." Section 1202(d)(1) defines "qualified small business" as "any domestic corporation which is a C corporation if * * * the aggregate gross assets of such corporation immediately after the issuance (determined by

taking into account amounts received in the issuance) do not exceed $50,000,000". To qualify for the exclusion under section 1202, the C corporation that issued the stock must have satisfied the gross assets test and constituted a qualified small business "as of the date of issuance" of such stock. Sec. 1202(c)(1)(A). Stock in such a C corporation, which "is acquired by the taxpayer at its original issue * * * as compensation for services provided to such corporation", constitutes "qualified small business stock" for purposes of section 1202. Sec. 1202(c)(1)(B).

Petitioner seeks to invoke section 1202 to exclude from his gross income 50 percent of the gain he realized on the sale of Intel stock that he had received by exercising his Intel options. Though petitioner concedes that he "sold the Intel Options [sic] on the same day he exercised them", he argues "that the Intel Options he exercised are in fact Qualified Small Business Stock * * * since they were received by converting the Cognet Options, during the M&A of Cognet with Intel." In support, petitioner cites section 1202(f), which provides:

> If any stock in a corporation is acquired solely through the conversion of other stock in such corporation which is qualified small business stock in the hands of the taxpayer--
>
> (1) the stock so acquired shall be treated as qualified small business stock in the hands of the taxpayer, and
>
> (2) the stock so acquired shall be treated as having been held during the period during which the converted stock was held.

Notwithstanding his citation of the provisions of section 1202(f) that allow for carryover treatment and tacking on of a holding period upon conversion of small business stock into other stock, petitioner does not assert that he ever held Cognet stock that he subsequently converted into Intel stock. Instead, petitioner seems to be arguing that references to the term "stock" in section 1202 should be read to include options to acquire stock. As we explain later, we do not believe that the term "stock" in section 1202 includes options to acquire stock. Even if it did, however, petitioner has failed to establish that Cognet constituted a qualified small business on the day or days that he received his options and that he held such options for more than 5 years.

There are no balance sheets or other financial statements of Cognet in the record that establish the amounts of total assets, total liabilities, or owner's equity of Cognet at any time, and petitioner made no attempt to introduce any such evidence at trial.[5] In the absence of any such evidence, we cannot determine

---

[5]After the trial petitioner attached to his reply brief a document purporting to be a statement by the chief executive officer of Cognet at the time of its acquisition by and merger with Intel declaring that "To the best of my recollection, the company's assets, including physical assets and total value of outstanding shares did not exceed $50,000,000 before the acquisition." [Emphasis added.] Subsequently, after the record had closed upon the filing of reply briefs, petitioner filed a motion for leave to reopen the record in order to introduce a notarized version of this and other documents. A notarized

(continued...)

the value of Cognet's gross assets at the time that it issued options to petitioner and, therefore, cannot conclude that Cognet constituted a qualified small business within the meaning of section 1202(d)(1) at that time.

The record is similarly devoid of facts that would establish petitioner's 5-year holding period for purposes of section 1202(a)(1). The only fact that can be ascertained in this respect is that petitioner held Intel options from the time of Cognet's merger with Intel sometime in 2001 until he exercised these options sometime in the fourth quarter of 2003, a period that could not have exceeded 3 years. There is no mention in the record of the date or dates when petitioner received Cognet options or how long he had held these options before Cognet merged with Intel. We are, therefore, unable to conclude that petitioner satisfied the 5-year holding period requirement of section 1202(a)(1).

Tax deductions are a matter of legislative grace, and a taxpayer has the burden of proving that he is entitled to the

---

[5](...continued)
written statement from Cognet's chief executive officer, even if it were introduced at trial, could have been subject to a hearsay objection and, absent concessions or stipulation by respondent, would probably not have been admitted into evidence. But here, where the purported statement constitutes an affidavit attached to a brief, Rule 143(b) explicitly bars us from considering it as evidence. We have previously issued an order denying petitioner's motion to reopen the record as inappropriate because petitioner has not shown good cause for his failure to introduce such evidence at trial.

deductions claimed. Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). Petitioner has failed to establish that Cognet was a qualified small business as specified in section 1202(d)(1). Further, even assuming arguendo that options are stock for purposes of section 1202(f), petitioner has not shown that he held his Cognet and Intel options for a combined duration of more than 5 years. Therefore, we hold that petitioner may not avail himself of the qualified small business stock exclusion of section 1202.

Even if Cognet was a qualified small business within the meaning of section 1202(d)(1) and petitioner had held his options for more than 5 years, on the facts we would remain unpersuaded that petitioner is entitled to the benefits of section 1202. Section 1202 refers to the "gain from the sale or exchange of qualified small business stock". Petitioner with his facts has failed to establish that the term "qualified small business stock", as used in section 1202, should be read to include his options to acquire such stock.

Section 1202 itself does not define the term "stock" or otherwise specify what securities constitute stock for purposes of the qualified small business stock exclusion. By comparison, some provisions of the Code explicitly specify that the term "stock" includes options to acquire stock. See, e.g., sec.

305(d)(1) ("For purposes of this section, the term 'stock' includes rights to acquire such stock."); sec. 1091(a) (same). We are unaware of any authority that has interpreted the term "stock" for purposes of section 1202.  However, we have previously declined to extend the term "stock" beyond its plain meaning in a statutory provision and construe it expansively to include options to acquire stock.  See Gantner v. Commissioner, 91 T.C. 713 (1988) (options to purchase stock are not "shares" of "stock or securities" under the plain language of section 1091, which was subsequently amended to explicitly provide otherwise), affd. 905 F.2d 241 (8th Cir. 1990).  Moreover, the legislative history of section 1202 suggests that Congress did not intend section 1202 to cover options to acquire stock.

Section 1202 was added to the Code by the Omnibus Budget Reconciliation Act of 1993, Pub. L. 103-66, sec. 13113(a), 107 Stat. 422.  The accompanying conference report included the following statement:  "Stock acquired by the taxpayer through the exercise of options * * * is treated as acquired at original issue.  The determination whether the gross assets test is met is made at the time of exercise * * * and the holding period of such stock is treated as beginning at that time."  H. Conf. Rept. 103-213, at 526 (1993), 1993-3 C.B. 393, 404 (emphasis added).  The second sentence of the excerpt from the conference report quoted above, in the absence of any countervailing argument by

petitioner, suggests to us that the original issuance contemplated by section 1202 in petitioner's case would be the issuance of Intel stock to petitioner upon exercise of his options. This conclusion seems appropriate since both the application of the gross assets test and the commencement of the holding period would occur at the time of such exercise.

Reading the term "stock" as used in section 1202 to exclude petitioner's options to acquire stock, we hold that petitioner could not possibly have satisfied the 5-year holding period requirement of section 1202(a)(1). Petitioner concedes that he sold the Intel stock received upon exercise of his options on the same day that he had exercised the options. Therefore, the period during which petitioner could have held qualified small business stock would, at most, have lasted 1 day. Moreover, for the stock underlying petitioner's options to constitute qualified small business stock under section 1202(d)(1), the aggregate gross assets of Intel on the date of exercise would have to have been less than or equal to $50 million. Petitioner makes no such claims with respect to Intel's aggregate gross assets.

Petitioner makes a second argument in an effort to alleviate the tax burden of the gain he realized from the sale of the Intel stock. He claims that he was a "partner of 'Thanikai Partners', an unincorporated partnership formed under the laws of the State of California on September 16, 1996", that he continued to remain

a partner of that partnership when he sold the Intel stock, and that he distributed the resulting "gain of the partnership to its partners, who wanted the distribution to be made according to partners' wishes."

Petitioner's argument flies in the face of a fundamental principle of tax law, that income is taxed to the person who earns it. Lucas v. Earl, 281 U.S. 111, 114-115 (1930). A taxpayer entitled to receive income cannot avoid tax on that income by assigning it to somebody else, even where the assignment precedes the receipt of income. See also Helvering v. Horst, 311 U.S. 112 (1940). However, petitioner is actually seeking to assign his income away after he has, in fact, received it. As stated above, petitioner's options to purchase Cognet stock constituted compensation for services rendered to that corporation. The Form W-2 petitioner received from Intel for the year 2003 establishes that petitioner had both earned and received the income representing the gain realized on the sale of the Intel stock. Whether petitioner was a partner in a partnership does not affect the fact that it was petitioner alone, and no other person or entity, that had earned and received this income. Petitioner cannot avoid tax on this income by claiming that the proceeds have been distributed to his partners.

II.  Software Design and Development Losses

Petitioner seeks deductions for losses that he claims to have suffered in connection with three separate software design and development agreements.  He alleges that after having delivered the contracted work he was left with unpaid invoices of $137,106, $3,211, and $168,740.  Petitioner argues that he "sustained losses from the agreements, with the delivery of the products and the non-payment of Invoices by the Customer".  Therefore, he should be allowed to deduct these uncollected amounts "in full under any of the * * * Sections 165, 166, 174(a) and 1060."

We consider in reverse order these four Code sections that petitioner has cited.  Section 1060 prescribes statutory allocation rules to be applied to multiasset sales in computing the seller's gains and losses and the buyer's basis and bears no relevance to petitioner's claimed losses.

Section 174(a) and (b) allows a taxpayer, at his election, to either deduct or defer and amortize over a period of not less than 60 months certain "research or experimental expenditures" which are paid or incurred by the taxpayer in connection with the operation of a trade or business.  Expenditures covered by section 174 include only costs for "research and development * * * in the experimental or laboratory sense."  Sec. 1.174-2(a)(1), Income Tax Regs.  This test is met if the

activities are "intended to discover information that would eliminate uncertainty concerning the development or improvement of a product." Id. Petitioner acknowledges that amounts invoiced under the software design and development agreements were for "unique customized functional software modules". It is unlikely, therefore, that expenditures made in connection with these software development agreements were "intended to discover information that would eliminate uncertainty concerning the development or improvement of a product." Expenditures made to develop and deliver functional products for use by customers do not usually constitute "research and development * * * in the experimental or laboratory sense." And though petitioner may very well have engaged in extensive testing of these software products in order to ensure compliance with customer specifications, costs of "the ordinary testing or inspection of materials or products for quality control" are excluded from the definition of research and experimental expenditures in section 174. See sec. 1.174-2(a)(3)(i), Income Tax Regs.

However, the Internal Revenue Service (IRS) has published guidance that advises taxpayers that "costs paid or incurred in developing software for any particular project, either for the taxpayer's own use or to be held by the taxpayer for sale or lease to others" and without regard to "whether or not the particular software is patented or copyrighted * * * in many

respects so closely resemble the kind of research and
experimental expenditures that fall within the purview of § 174
as to warrant similar accounting treatment."  Rev. Proc. 2000-50,
sec. 5.01, 2000-2 C.B. 601, 601.  Accordingly, the IRS "will not
disturb a taxpayer's treatment" of such costs, where all of them
either

> (1) * * * are consistently treated as current expenses
> and deducted in full in accordance with rules similar to
> those applicable under § 174(a); or

> (2) * * * are consistently treated as capital
> expenditures that are recoverable through deductions for
> ratable amortization, in accordance with rules similar to
> those provided by § 174(b) and the regulations thereunder,
> over a period of 60 months from the date of completion of
> the development * * *

Id.

Pursuant to Rev. Proc. 2000-50, sec. 5.01(1), a cash basis
taxpayer could deduct "All of the costs properly attributable to
the development of software" in the year that the taxpayer makes
payment on such costs.  An accrual or mixed basis taxpayer could
either deduct such costs in the year that they are incurred or,
alternatively, treat them as deferred expenses chargeable to
capital account and amortize them over a period of 60 months
after development of the software has been completed.  In the
Schedules C filed with petitioner's original Federal income tax
return for 2003 and its successive amendments, petitioner has
consistently checked the box for "cash" in the line item for the
taxpayer's method of accounting.  However, in a posttrial brief,

petitioner claims that though he "was primarily a Cash Basis taxpayer for 2003 * * *, some items which were reported qualify under both Cash Basis, and Accrual Basis of Accounting." As a result, "Petitioner specifically demands to * * * report (deduct) [such items] under the Accrual Method of Accounting."

Petitioner's claims advanced in a posttrial brief do not constitute evidence, and we disregard them. See Rule 143(b). On the basis of the method of accounting that petitioner declared on his 2003 Federal income tax return, we treat him as a cash basis taxpayer for tax year 2003. Consequently, under Rev. Proc. 2000-50, supra, petitioner may deduct as software development expenses only such expenditures attributable to his three software development agreements that were paid by him in 2003 and that were not otherwise allowed as deductions. However, petitioner has failed to introduce any evidence of actual out-of-pocket expenditures that he made in 2003 and that he has not thus far deducted in connection with any one of the three software agreements at issue. Instead, petitioner merely cites Rev. Proc. 2000-50, supra, and insists in self-serving conclusory fashion that he "incurred losses from the sale of customized software", that the amount of such losses "is clearly evidenced in the purchase orders and invoices", and that this amount "is entitled for a full deduction" because "he did not charge his capital account or other expense accounts" for such losses. But at trial

he did not call witnesses or introduce evidence that proved any of these claims.

We further note that petitioner's arguments for the deductibility of software development expenses would remain unavailing even if we were to accede to his demands in his posttrial brief and treat him as an accrual basis taxpayer for purposes of these three software development agreements. Under Rev. Proc. 2000-50, supra, as an accrual or mixed basis taxpayer, petitioner could deduct previously undeducted costs in connection with the three software development projects that were incurred in 2003 regardless of when the payments were made so long as such costs were incurred or accrued during the 2003 tax year. Costs incurred in an earlier year and capitalized in that year would be subject to amortization over either 36 or 60 months, with any unamortized balance becoming deductible in the year of disposition or abandonment. However, petitioner provides no evidence in the form of canceled checks, bank statements, bills or receipts of having actually made any such payments that have not been otherwise allowed as deductions. Nor does he show that such costs were incurred or accrued in 2003 and are, therefore, properly taken into account in the 2003 tax year.

For similar reasons, we remain unpersuaded by petitioner's sincere arguments under sections 165 and 166. These arguments would have been persuasive to the extent petitioner established

that he had a tax basis in the receivables or that the claimed losses on the software agreements represented out-of-pocket expenditures that he has made but not yet deducted.  He has established neither.  For such expenditures, section 165(c)(2) might have allowed an ordinary deduction for a business loss. Alternatively, subject to satisfaction of other applicable conditions, section 166(d) might have permitted a short-term capital loss deduction for a worthless bad debt.  However, petitioner has failed to introduce any evidence of actual undeducted cash expenditures that he has made (i.e., costs that he has incurred) in connection with any one of the three software agreements at issue here.  Instead, petitioner alleges in a posttrial brief that "he provided to the Commissioner copies of purchase orders, invoices, agreements, and letters * * * [and] copies of collection letters that [he] had sent to the customer[s]" in support of his contention "that the claimed 'software design and development' loss * * * should be allowed in full".

"It is well settled that a taxpayer is not allowed to reduce ordinary income actually received by the amount of income he failed to receive." Hendricks v. Commissioner, 406 F.2d 269, 272 (5th Cir. 1969), affg. T.C. Memo. 1967-140; see also Escofil v. Commissioner, 464 F.2d 358, 359 (3d Cir. 1972), affg. T.C. Memo. 1971-131; Hutcheson v. Commissioner, 17 T.C. 14, 19 (1951).

Indeed, it is axiomatic that a deduction cannot be claimed for profits that will never be reported as income. Hort v. Commissioner, 313 U.S. 28, 32-33 (1941); J.G. Boswell Co. v. Commissioner, 34 T.C. 539, 545 (1960), affd. 302 F.2d 682 (9th Cir. 1962). Therefore, petitioner may not claim as a business loss any part of the uncollected amounts on the three software agreements.

Similarly, petitioner's claim of a worthless debt under section 166 cannot be allowed. Section 166(d) allows "a taxpayer other than a corporation" a deduction for "any nonbusiness debt [which] becomes worthless within the taxable year." However, worthless debts arising from unpaid wages, fees, and similar items of taxable income are not deductible as bad debts unless the taxpayer has included the amounts in income for the year for which the bad debts are deducted or for a prior tax year because otherwise they have no tax basis.

> The debts petitioners claimed are for unpaid fees for petitioner's services. Petitioners used the cash method for reporting income and deductions; therefore, fees for services that remain unpaid have not been included in income. Such debts do not constitute "bad debts" within the meaning of section 166 for which a deduction for worthlessness may be claimed. * * *

Crosson v. Commissioner, T.C. Memo. 2003-170; see also Gertz v. Commissioner, 64 T.C. 598, 600 (1975); Prowse v. Commissioner, T.C. Memo. 2006-120.

III. Trade or Business Expenses

A.   General Deduction Rules

Deductions are a matter of legislative grace, and the taxpayer must maintain adequate records to substantiate the amounts of any deductions or credits claimed.  Sec. 6001; INDOPCO, Inc. v. Commissioner, 503 U.S. at 84; sec. 1.6001-1(a), Income Tax Regs.

Generally, the Court may allow the deduction of a claimed expense (other than those subjected to the strict substantiation requirements of section 274) even where the taxpayer is unable to fully substantiate it, provided the Court has an evidentiary basis for doing so.  Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930); Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985); sec. 1.274-5T(a), Temporary Income Tax Regs., 50 Fed. Reg. 46014 (Nov. 6, 1985).  In these instances, the Court is permitted to approximate the allowable expense, bearing heavily against the taxpayer whose inexactitude is of his or her own making.  Cohan v. Commissioner, supra at 544.

B.   Deductibility of Expenses Relating to Petitioner's Schedule C

Section 162(a) authorizes a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business".  A trade or business expense is ordinary for purposes of section 162 if it is normal or customary within a particular trade, business, or industry and

is necessary if it is appropriate and helpful for the development of the business. <u>Commissioner v. Heininger</u>, 320 U.S. 467, 471 (1943); <u>Deputy v. du Pont</u>, 308 U.S. 488, 495 (1940). In contrast, "personal, living, or family expenses" are generally nondeductible. See sec. 262(a).

Certain business expenses described in section 274(d) are subject to strict substantiation rules that supersede the <u>Cohan</u> doctrine. <u>Sanford v. Commissioner</u>, 50 T.C. 823, 827-828 (1968), affd. 412 F.2d 201 (2d Cir. 1969); sec. 1.274-5T(a), Temporary Income Tax Regs., <u>supra</u>. Section 274(d) applies to: (1) Any traveling expense, including meals and lodging away from home; (2) entertainment, amusement, and recreational expenses; (3) any expense for gifts; or (4) the use of "listed property", as defined in section 280F(d)(4), including passenger automobiles. To deduct such expenses, the taxpayer must substantiate by adequate records or sufficient evidence to corroborate the taxpayer's own testimony: (1) The amount of the expenditure or use, which includes mileage in the case of automobiles; (2) the time and place of the travel, entertainment, or use; (3) its business purpose; and in the case of entertainment, (4) the business relationship to the taxpayer of each expenditure or use. Sec. 274(d) (flush language).

Petitioner claims as trade or business expense deductions under section 162 the following amounts: $14,701 for meals and

entertainment;[6] $1,509 for advertising; $1,000 for home office rent; and $200 for utilities. Petitioner asserts that he incurred these expenses on behalf of Thanikai Partners, of which he is a partner. Meals and entertainment expenses claimed as deductions under section 162 are, with limited exceptions, subject to the substantiation requirements of section 274(d). Section 1.274-5T(c), Temporary Income Tax Regs., 50 Fed. Reg. 46016 (Nov. 6, 1985), requires a taxpayer to substantiate each element of an expenditure by adequate record or by sufficient evidence corroborating his own statements. Petitioner here has made no attempt to do so. Instead, at trial, he sought to introduce a printout of a self-created computer record of meals and entertainment expenditures, a so-called meals and entertainment substantiation log. This log was unaccompanied by any primary evidence of the expenditures in the form of receipts, paid bills, credit card receipts or cancelled checks. In his posttrial briefs, petitioner does not argue that his claimed deductions for meals and entertainment expenses are excepted from the substantiation requirements of section 274(d). Instead, he makes detailed and highly involved arguments on why the 50-

---

[6]This was both the total amount of expenses reported and the total amount of deductions claimed for meals and entertainment. Petitioner argued for an exception to the general rule under sec. 274(n)(1) that only 50 percent of meals and entertainment expenses be allowed as deduction. As discussed infra, we consider it irrelevant to examine whether such an exception applies here.

percent limitation on meals and entertainment expenses under section 274(n) does not apply.

In the absence of any showing as to when petitioner created the record of these expenditures and of any primary evidence that he had in fact incurred these expenditures, we hold that petitioner has not met the standard of proof set forth in section 1.274-5T(c), Temporary Income Tax Regs., supra, for substantiating deductions relating to meals and entertainment. We, therefore, disallow such claimed expenses in their entirety and have no reason to address petitioner's arguments regarding the inapplicability of the 50-percent limitation on such deductions.

Petitioner has also failed to substantiate the claimed deduction for advertising. Petitioner's substantiation was limited to a printout of a computer record, a self-styled "advertisement substantiation log" that purportedly listed advertising-related expenditures, the majority of which actually referred to meals. In his posttrial reply brief, petitioner has sought to explain this reference by arguing that he is reporting "advertisement related business meals under the Advertisement substantiation log * * * and all other business meals under [the separate] meals, and entertainment substantiation log". The substantiation requirements of section 274(d) for meals and entertainment expenses do not allow for an exception merely

because the expense was related to advertising. Thus, for the reasons discussed above regarding the substantiation of meals and entertainment expenses, we disallow the claimed deductions with respect to business meals that petitioner describes as advertisement related.

We also disallow deductions for all other claimed advertising expenses. Petitioner has presented no primary evidence of having incurred such expenditures or shown how such expenditures were related to his trade and business. He has, therefore, failed to meet the adequate records requirement for claiming these deductions.

Petitioner's substantiation for rent and utilities is also limited to a printout of a computer record or log of such expenditures. In his posttrial briefs, petitioner argues that the deductions for rent and utilities should be allowed for use of a rental unit as a home office. For a home office deduction, section 280A requires a showing that the portion of the dwelling unit claimed as a home office be exclusively used on a regular basis as the principal place of business of the taxpayer. Further, section 280A requires that, in the case of a taxpayer who is an employee, the use of the dwelling be for the convenience of the taxpayer's employer. Petitioner was an employee of Intel during the year 2003 and is presumably referring to Intel when he states in a posttrial brief that "Due

to space constraints at Employer Corporation, the Taxpayer with verbal assurances from employer used his home office for research purposes". Petitioner also claims he used the home office for administrative and management activities relating to his alleged trade or business as an "Engineer". However, other than such self-serving allegations in his posttrial briefs that do not constitute evidence under Rule 143(b), petitioner has introduced no evidence, credible or otherwise, to establish the showing required under section 280A. We, therefore, deny petitioner's claimed deductions for rent and utilities.

IV. Section 6651(a)(1) Addition to Tax

Petitioner filed his 2003 return over 6 months after its due date. Respondent has, thus, met his burden of production under section 7491(c), and in order to avoid the section 6651(a)(1) addition to tax, petitioner has the burden of proving reasonable cause and the absence of willful neglect for failure to file on time. Petitioner, however, failed to offer any explanation at trial for the delay. Instead, in a posttrial brief, petitioner "admits Respondent's stated filing dates [sic] for the Original Tax Return" and goes on to boldly declare that "when the Court finds that Petitioner does not owe on the Deficiency, the penalties, and interest calculated as liabilities against the Petitioner * * * would become zero." Since the petitioner has admitted to the late filing and failed to offer any reason, let

alone an excuse, for the delay, we uphold the addition to tax under section 6651(a)(1) for late filing.

The Court has considered all of petitioner's contentions, arguments, requests, and statements.  To the extent not discussed herein, we conclude that they are meritless, moot, or irrelevant.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.