# INDOPCO, INC. *v.* COMMISSIONER OF INTERNAL REVENUE

No. 90–1278.   Argued November 12, 1991—Decided February 26, 1992

BLACKMUN, J., delivered the opinion for a unanimous Court.

*Richard J. Hiegel* argued the cause for petitioner. With him on the briefs were *Geoffrey R. S. Brown, Rory O. Millson,* and *Richard H. Walker.*

*Kent L. Jones* argued the cause for respondent. With him on the brief were *Solicitor General Starr, Assistant Attorney General Peterson, Deputy Solicitor General Wallace, Gilbert S. Rothenberg,* and *Bruce R. Ellisen.** 

JUSTICE BLACKMUN delivered the opinion of the Court.

In this case we must decide whether certain professional expenses incurred by a target corporation in the course of a friendly takeover are deductible by that corporation as "ordinary and necessary" business expenses under § 162(a) of the Internal Revenue Code.

I

Most of the relevant facts are stipulated. See App. 12, 149. Petitioner INDOPCO, Inc., formerly named National Starch and Chemical Corporation and hereinafter referred to as National Starch, is a Delaware corporation that manufactures and sells adhesives, starches, and specialty chemical products. In October 1977, representatives of Unilever United States, Inc., also a Delaware corporation (Unilever),[1] expressed interest in acquiring National Starch, which was one of its suppliers, through a friendly transaction. National Starch at the time had outstanding over 6,563,000 common shares held by approximately 3,700 shareholders. The stock was listed on the New York Stock Exchange. Frank and Anna Greenwall were the corporation's largest shareholders and owned approximately 14.5% of the common. The Greenwalls, getting along in years and concerned about

---

*Timothy J. McCormally* and *Mary L. Fahey* filed a brief for the Tax Executives Institute, Inc., as *amicus curiae* urging reversal.

[1] Unilever is a holding company. Its then principal subsidiaries were Lever Brothers Co. and Thomas J. Lipton, Inc.

their estate plans, indicated that they would transfer their shares to Unilever only if a transaction tax free for them could be arranged.

Lawyers representing both sides devised a "reverse subsidiary cash merger" that they felt would satisfy the Greenwalls' concerns. Two new entities would be created—National Starch and Chemical Holding Corp. (Holding), a subsidiary of Unilever, and NSC Merger, Inc., a subsidiary of Holding that would have only a transitory existence. In an exchange specifically designed to be tax free under § 351 of the Internal Revenue Code, 26 U. S. C. § 351, Holding would exchange one share of its nonvoting preferred stock for each share of National Starch common that it received from National Starch shareholders. Any National Starch common that was not so exchanged would be converted into cash in a merger of NSC Merger, Inc., into National Starch.

In November 1977, National Starch's directors were formally advised of Unilever's interest and the proposed transaction. At that time, Debevoise, Plimpton, Lyons & Gates, National Starch's counsel, told the directors that under Delaware law they had a fiduciary duty to ensure that the proposed transaction would be fair to the shareholders. National Starch thereupon engaged the investment banking firm of Morgan Stanley & Co., Inc., to evaluate its shares, to render a fairness opinion, and generally to assist in the event of the emergence of a hostile tender offer.

Although Unilever originally had suggested a price between $65 and $70 per share, negotiations resulted in a final offer of $73.50 per share, a figure Morgan Stanley found to be fair. Following approval by National Starch's board and the issuance of a favorable private ruling from the Internal Revenue Service that the transaction would be tax free under § 351 for those National Starch shareholders who ex-

changed their stock for Holding preferred, the transaction was consummated in August 1978.[2]

Morgan Stanley charged National Starch a fee of $2,200,000, along with $7,586 for out-of-pocket expenses and $18,000 for legal fees. The Debevoise firm charged National Starch $490,000, along with $15,069 for out-of-pocket expenses. National Starch also incurred expenses aggregating $150,962 for miscellaneous items—such as accounting, printing, proxy solicitation, and Securities and Exchange Commission fees—in connection with the transaction. No issue is raised as to the propriety or reasonableness of these charges.

On its federal income tax return for its short taxable year ended August 15, 1978, National Starch claimed a deduction for the $2,225,586 paid to Morgan Stanley, but did not deduct the $505,069 paid to Debevoise or the other expenses. Upon audit, the Commissioner of Internal Revenue disallowed the claimed deduction and issued a notice of deficiency. Petitioner sought redetermination in the United States Tax Court, asserting, however, not only the right to deduct the investment banking fees and expenses but, as well, the legal and miscellaneous expenses incurred.

The Tax Court, in an unreviewed decision, ruled that the expenditures were capital in nature and therefore not deductible under § 162(a) in the 1978 return as "ordinary and necessary expenses." *National Starch and Chemical Corp.* v. *Commissioner*, 93 T. C. 67 (1989). The court based its holding primarily on the long-term benefits that accrued to National Starch from the Unilever acquisition. *Id.*, at 75. The United States Court of Appeals for the Third Circuit affirmed, upholding the Tax Court's findings that "both Unilever's enormous resources and the possibility of synergy arising from the transaction served the long-term better-

---

[2] Approximately 21% of National Starch common was exchanged for Holding preferred. The remaining 79% was exchanged for cash. App. 14.

ment of National Starch." *National Starch & Chemical Corp.* v. *Commissioner*, 918 F. 2d 426, 432–433 (1990). In so doing, the Court of Appeals rejected National Starch's contention that, because the disputed expenses did not "create or enhance . . . a separate and distinct additional asset," see *Commissioner* v. *Lincoln Savings & Loan Assn.*, 403 U. S. 345, 354 (1971), they could not be capitalized and therefore were deductible under § 162(a). 918 F. 2d, at 428–431. We granted certiorari to resolve a perceived conflict on the issue among the Courts of Appeals.[3] 500 U. S. 914 (1991).

## II

Section 162(a) of the Internal Revenue Code allows the deduction of "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." 26 U. S. C. § 162(a). In contrast, § 263 of the Code allows no deduction for a capital expenditure—an "amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate." § 263(a)(1). The primary effect of characterizing a payment as either a business expense or a capital expenditure concerns the timing of the taxpayer's cost recovery: While business expenses are currently deductible, a capital expenditure usually is amortized and depreci-

---

[3] Compare the Third Circuit's opinion, 918 F. 2d, at 430, with *NCNB Corp.* v. *United States*, 684 F. 2d 285, 293–294 (CA4 1982) (bank expenditures for expansion-related planning reports, feasibility studies, and regulatory applications did not "create or enhance separate and identifiable assets," and therefore were ordinary and necessary expenses under § 162(a)), and *Briarcliff Candy Corp.* v. *Commissioner*, 475 F. 2d 775, 782 (CA2 1973) (suggesting that *Lincoln Savings* "brought about a radical shift in emphasis," making capitalization dependent on whether the expenditure creates or enhances a separate and distinct additional asset). See also *Central Texas Savings & Loan Assn.* v. *United States*, 731 F. 2d 1181, 1184 (CA5 1984) (inquiring whether establishment of new branches "creates a separate and distinct additional asset" so that capitalization is the proper tax treatment).

ated over the life of the relevant asset, or, where no specific asset or useful life can be ascertained, is deducted upon dissolution of the enterprise. See 26 U. S. C. §§ 167(a) and 336(a); Treas. Reg. § 1.167(a), 26 CFR § 1.167(a) (1991). Through provisions such as these, the Code endeavors to match expenses with the revenues of the taxable period to which they are properly attributable, thereby resulting in a more accurate calculation of net income for tax purposes. See, *e. g., Commissioner* v. *Idaho Power Co.*, 418 U. S. 1, 16 (1974); *Ellis Banking Corp.* v. *Commissioner*, 688 F. 2d 1376, 1379 (CA11 1982), cert. denied, 463 U. S. 1207 (1983).

In exploring the relationship between deductions and capital expenditures, this Court has noted the "familiar rule" that "an income tax deduction is a matter of legislative grace and that the burden of clearly showing the right to the claimed deduction is on the taxpayer." *Interstate Transit Lines* v. *Commissioner*, 319 U. S. 590, 593 (1943); *Deputy* v. *Du Pont*, 308 U. S. 488, 493 (1940); *New Colonial Ice Co.* v. *Helvering*, 292 U. S. 435, 440 (1934). The notion that deductions are exceptions to the norm of capitalization finds support in various aspects of the Code. Deductions are specifically enumerated and thus are subject to disallowance in favor of capitalization. See §§ 161 and 261. Nondeductible capital expenditures, by contrast, are not exhaustively enumerated in the Code; rather than providing a "complete list of nondeductible expenditures," *Lincoln Savings*, 403 U. S., at 358, § 263 serves as a general means of distinguishing capital expenditures from current expenses. See *Commissioner* v. *Idaho Power Co.*, 418 U. S., at 16. For these reasons, deductions are strictly construed and allowed only "as there is a clear provision therefor." *New Colonial Ice Co.* v. *Helvering*, 292 U. S., at 440; *Deputy* v. *Du Pont*, 308 U. S., at 493.[4]

---

[4] See also Johnson, The Expenditures Incurred by the Target Corporation in an Acquisitive Reorganization are Dividends to the Shareholders, 53 Tax Notes 463, 478 (1991) (noting the importance of a "strong law of capitalization" to the tax system).

The Court also has examined the interrelationship between the Code's business expense and capital expenditure provisions.[5]  In so doing, it has had occasion to parse § 162(a) and explore certain of its requirements.  For example, in *Lincoln Savings,* we determined that, to qualify for deduction under § 162(a), "an item must (1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense."  403 U. S., at 352.  See also *Commissioner* v. *Tellier,* 383 U. S. 687, 689 (1966) (the term "necessary" imposes "only the minimal requirement that the expense be 'appropriate and helpful' for 'the development of the [taxpayer's] business,'" quoting *Welch* v. *Helvering,* 290 U. S. 111, 113 (1933)); *Deputy* v. *Du Pont,* 308 U. S., at 495 (to qualify as "ordinary," the expense must relate to a transaction "of common or frequent occurrence in

---

[5] See, *e. g., Commissioner* v. *Idaho Power Co.,* 418 U. S. 1 (1974) (equipment depreciation allocable to construction of capital facilities is to be capitalized); *United States* v. *Mississippi Chemical Corp.,* 405 U. S. 298 (1972) (cooperatives' required purchases of stock in Bank for Cooperatives are not currently deductible); *Commissioner* v. *Lincoln Savings & Loan Assn.,* 403 U. S. 345 (1971) (additional premiums paid by bank to federal insurers are capital expenditures); *Woodward* v. *Commissioner,* 397 U. S. 572 (1970) (legal, accounting, and appraisal expenses incurred in purchasing minority stock interest are capital expenditures); *United States* v. *Hilton Hotels Corp.,* 397 U. S. 580 (1970) (consulting, legal, and other professional fees incurred by acquiring firm in minority stock appraisal proceeding are capital expenditures); *Commissioner* v. *Tellier,* 383 U. S. 687 (1966) (legal expenses incurred in defending against securities fraud charges are deductible under § 162(a)); *Commissioner* v. *Heininger,* 320 U. S. 467 (1943) (legal expenses incurred in disputing adverse postal designation are deductible as ordinary and necessary expenses); *Interstate Transit Lines* v. *Commissioner,* 319 U. S. 590 (1943) (payment by parent company to cover subsidiary's operating deficit is not deductible as a business expense); *Deputy* v. *Du Pont,* 308 U. S. 488 (1940) (expenses incurred by shareholder in helping executives of company acquire stock are not deductible); *Helvering* v. *Winmill,* 305 U. S. 79 (1938) (brokerage commissions are capital expenditures); *Welch* v. *Helvering,* 290 U. S. 111 (1933) (payments of former employer's debts are capital expenditures).

the type of business involved"). The Court has recognized, however, that the "decisive distinctions" between current expenses and capital expenditures "are those of degree and not of kind," *Welch* v. *Helvering,* 290 U. S., at 114, and that because each case "turns on its special facts," *Deputy* v. *Du Pont,* 308 U. S., at 496, the cases sometimes appear difficult to harmonize. See *Welch* v. *Helvering,* 290 U. S., at 116.

National Starch contends that the decision in *Lincoln Savings* changed these familiar backdrops and announced an exclusive test for identifying capital expenditures, a test in which "creation or enhancement of an asset" is a prerequisite to capitalization, and deductibility under § 162(a) is the rule rather than the exception. Brief for Petitioner 16. We do not agree, for we conclude that National Starch has overread *Lincoln Savings.*

In *Lincoln Savings,* we were asked to decide whether certain premiums, required by federal statute to be paid by a savings and loan association to the Federal Savings and Loan Insurance Corporation (FSLIC), were ordinary and necessary expenses under § 162(a), as Lincoln Savings argued and the Court of Appeals had held, or capital expenditures under § 263, as the Commissioner contended. We found that the "additional" premiums, the purpose of which was to provide FSLIC with a secondary reserve fund in which each insured institution retained a pro rata interest recoverable in certain situations, "serv[e] to create or enhance for Lincoln what is essentially a separate and distinct additional asset." 403 U. S., at 354. "[A]s an inevitable consequence," we concluded, "the payment is capital in nature and not an expense, let alone an ordinary expense, deductible under § 162(a)." *Ibid.*

*Lincoln Savings* stands for the simple proposition that a taxpayer's expenditure that "serves to create or enhance . . . a separate and distinct" asset should be capitalized under § 263. It by no means follows, however, that *only* expenditures that create or enhance separate and distinct assets are

to be capitalized under § 263. We had no occasion in *Lincoln Savings* to consider the tax treatment of expenditures that, unlike the additional premiums at issue there, did not create or enhance a specific asset, and thus the case cannot be read to preclude capitalization in other circumstances. In short, *Lincoln Savings* holds that the creation of a separate and distinct asset well may be a sufficient, but not a necessary, condition to classification as a capital expenditure. See *General Bancshares Corp.* v. *Commissioner*, 326 F. 2d 712, 716 (CA8) (although expenditures may not "resul[t] in the acquisition or increase of a corporate asset, . . . these expenditures are not, because of that fact, deductible as ordinary and necessary business expenses"), cert. denied, 379 U. S. 832 (1964).

Nor does our statement in *Lincoln Savings*, 403 U. S., at 354, that "the presence of an ensuing benefit that may have some future aspect is not controlling" prohibit reliance on future benefit as a means of distinguishing an ordinary business expense from a capital expenditure.[6] Although the mere presence of an incidental future benefit—"*some* future aspect"—may not warrant capitalization, a taxpayer's realization of benefits beyond the year in which the expenditure is incurred is undeniably important in determining whether the appropriate tax treatment is immediate deduction or capitalization. See *United States* v. *Mississippi Chemical Corp.*, 405 U. S. 298, 310 (1972) (expense that "is of value in more than one taxable year" is a nondeductible capital expenditure); *Central Texas Savings & Loan Assn.* v. *United States*, 731 F. 2d 1181, 1183 (CA5 1984) ("While the period of the benefits may not be controlling in all cases, it nonetheless

---

[6] Petitioner contends that, absent a separate-and-distinct-asset requirement for capitalization, a taxpayer will have no "principled basis" upon which to differentiate business expenses from capital expenditures. Brief for Petitioner 37–41. We note, however, that grounding tax status on the existence of an asset would be unlikely to produce the bright-line rule that petitioner desires, given that the notion of an "asset" is itself flexible and amorphous. See Johnson, 53 Tax Notes, at 477–478.

remains a prominent, if not predominant, characteristic of a capital item"). Indeed, the text of the Code's capitalization provision, § 263(a)(1), which refers to "permanent improvements or betterments," itself envisions an inquiry into the duration and extent of the benefits realized by the taxpayer.

### III

In applying the foregoing principles to the specific expenditures at issue in this case, we conclude that National Starch has not demonstrated that the investment banking, legal, and other costs it incurred in connection with Unilever's acquisition of its shares are deductible as ordinary and necessary business expenses under § 162(a).

Although petitioner attempts to dismiss the benefits that accrued to National Starch from the Unilever acquisition as "entirely speculative" or "merely incidental," Brief for Petitioner 39–40, the Tax Court's and the Court of Appeals' findings that the transaction produced significant benefits to National Starch that extended beyond the tax year in question are amply supported by the record. For example, in commenting on the merger with Unilever, National Starch's 1978 "Progress Report" observed that the company would "benefit greatly from the availability of Unilever's enormous resources, especially in the area of basic technology." App. 43. See also *id.*, at 46 (Unilever "provides new opportunities and resources"). Morgan Stanley's report to the National Starch board concerning the fairness to shareholders of a possible business combination with Unilever noted that National Starch management "feels that some synergy may exist with the Unilever organization given a) the nature of the Unilever chemical, paper, plastics and packaging operations . . . and b) the strong consumer products orientation of Unilever United States, Inc." *Id.*, at 77–78.

In addition to these anticipated resource-related benefits, National Starch obtained benefits through its transformation from a publicly held, freestanding corporation into a wholly

owned subsidiary of Unilever. The Court of Appeals noted that National Starch management viewed the transaction as "'swapping approximately 3500 shareholders for one.'" 918 F. 2d, at 427; see also App. 223. Following Unilever's acquisition of National Starch's outstanding shares, National Starch was no longer subject to what even it terms the "substantial" shareholder-relations expenses a publicly traded corporation incurs, including reporting and disclosure obligations, proxy battles, and derivative suits. Brief for Petitioner 24. The acquisition also allowed National Starch, in the interests of administrative convenience and simplicity, to eliminate previously authorized but unissued shares of preferred and to reduce the total number of authorized shares of common from 8,000,000 to 1,000. See 93 T. C., at 74.

Courts long have recognized that expenses such as these, "'incurred for the purpose of changing the corporate structure for the benefit of future operations are not ordinary and necessary business expenses.'" *General Bancshares Corp.* v. *Commissioner*, 326 F. 2d, at 715 (quoting *Farmers Union Corp.* v. *Commissioner*, 300 F. 2d 197, 200 (CA9), cert. denied, 371 U. S. 861 (1962)). See also B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders 5–33 to 5–36 (5th ed. 1987) (describing "well-established rule" that expenses incurred in reorganizing or restructuring corporate entity are not deductible under § 162(a)). Deductions for professional expenses thus have been disallowed in a wide variety of cases concerning changes in corporate structure.[7] Although support for these decisions can be

---

[7] See, *e. g., McCrory Corp.* v. *United States*, 651 F. 2d 828 (CA2 1981) (statutory merger under 26 U. S. C. § 368(a)(1)(A)); *Bilar Tool & Die Corp.* v. *Commissioner*, 530 F. 2d 708 (CA6 1976) (division of corporation into two parts); *E. I. du Pont de Nemours & Co.* v. *United States*, 432 F. 2d 1052 (CA3 1970) (creation of new subsidiary to hold assets of prior joint venture); *General Bancshares Corp.* v. *Commissioner*, 326 F. 2d 712, 715 (CA8) (stock dividends), cert. denied, 379 U. S. 832 (1964); *Mills Estate, Inc.* v. *Commissioner*, 206 F. 2d 244 (CA2 1953) (recapitalization).

found in the specific terms of § 162(a), which require that deductible expenses be "ordinary and necessary" and incurred "in carrying on any trade or business,"[8] courts more frequently have characterized an expenditure as capital in nature because "the purpose for which the expenditure is made has to do with the corporation's operations and betterment, sometimes with a continuing capital asset, for the duration of its existence or for the indefinite future or for a time somewhat longer than the current taxable year." *General Bancshares Corp.* v. *Commissioner*, 326 F. 2d, at 715. See also *Mills Estate, Inc.* v. *Commissioner*, 206 F. 2d 244, 246 (CA2 1953). The rationale behind these decisions applies equally to the professional charges at issue in this case.

## IV

The expenses that National Starch incurred in Unilever's friendly takeover do not qualify for deduction as "ordinary and necessary" business expenses under § 162(a). The fact that the expenditures do not create or enhance a separate and distinct additional asset is not controlling; the acquisition-related expenses bear the indicia of capital expenditures and are to be treated as such.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

---

[8] See, *e. g., Motion Picture Capital Corp.* v. *Commissioner*, 80 F. 2d 872, 873–874 (CA2 1936) (recognizing that expenses may be "ordinary and necessary" to corporate merger, and that mergers may be "ordinary and necessary business occurrences," but declining to find that merger is part of "ordinary and necessary business activities," and concluding that expenses are therefore not deductible); Greenstein, The Deductibility of Takeover Costs After *National Starch*, 69 Taxes 48, 49 (1991) (expenses incurred to facilitate transfer of business ownership do not satisfy the "carrying on [a] trade or business" requirement of § 162(a)).